**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA

v.

Case No. 26-cr-02348-MIS

VICENTE LOPEZ-PADILLA,

Defendant.

**ORDER GRANTING THE GOVERNMENT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE**

**THIS MATTER** is before the Court on the United States' Motion in Limine ("Motion"), ECF No. 37, filed on September 15, 2025. Defendant Vicente Lopez-Padilla filed a Response ("Response") on September 22, 2026, ECF No. 46, to which the United States filed a Reply ("Reply") on October 1, 2026, ECF No. 52. Mr. Lopez-Padilla filed a Sur-reply on October 8, 2026, ECF No. 67 ("Sur-reply"), with leave of the Court, ECF No. 58. In addition, this Motion concerns arguments made in Defendant's Notice of Necessity Defense, ECF No. 66, and the Government's Response to Defendant's Notice of Necessity Defense, ECF No. 76.

Upon review of the Parties' submissions, the record, and the relevant law, the Court will **GRANT** the Motion.

## I. Background

On approximately December 17, 2025, Mr. Lopez-Padilla, a Cuban national, was excluded, deported, and removed from the United States as a third-country deportee to Mexico. Indictment, ECF No. 13. Around three months later, on February 9, 2026, United States Border Patrol arrested Mr. Lopez-Padilla in Doña Ana County, New Mexico. Crim. Compl., ECF No. 1. On May 12, 2026, Mr. Lopez-Padilla was indicted by a grand jury on charges of knowingly attempting to enter, and entering, the United States contrary to law due to the outstanding Order of Exclusion,

Deportation, and Removal from 2025. Indictment. The Court then scheduled Mr. Lopez-Padilla's trial for October 22, 2026. *See* ECF No. 41.

The Government filed this Motion, moving for an order in limine that would prohibit Mr. Lopez-Padilla from mentioning or putting forth any claim that he: (1) "was not aware that he entered the United States illegally;" (2) "was under the mistaken belief that he was authorized to enter the United States;" (3) "was not aware of his prior deportation when he entered the United States;" or (4) "returned for a specific reason, absent an independently relevant purpose or a legally sufficient affirmative defense," including "an incomplete duress defense and related expert or lay testimony" without first making a "sufficient evidentiary proffer outside the jury's presence."[1] [2] Mot. at 1.

Mr. Lopez-Padilla has given notice that he intends to present affirmative defenses of duress and necessity at trial. ECF Nos. 46, 66. Accordingly, he has proffered evidence seeking to establish that a reasonable jury could find for him, by a preponderance of the evidence, if instructed on the duress and/or necessity defenses. This proffer occurred at the pre-trial hearing for this case on October 20, 2026, and largely reflected the facts as briefed. ECF No. 41. The proffer itself included a two-page medical record and testimony from Mr. Lopez-Padilla. Tr. of H'rg of Oct. 20, 2026, at 12:5–13:3. The Defense presented no additional documents or evidence supporting the affirmative defenses. *Id.*

Mr. Lopez-Padilla, a 65-year-old Cuban national unable to return to Cuba by law, proffered that he was arrested in September of 2025 in the United States and removed to Mexico as a third-

---

[1] Mr. Lopez-Padilla's Response and Sur-Reply focus only on arguments related to the prima facie cases for duress and necessity. He does not respond to the exclusions the Government moved for in numbers (1), (2), or (3), apparently conceding the Government's arguments. Furthermore, Defense counsel conceded these three exclusions at the pre-trial hearing. Tr. of H'rg of Oct. 20, 2026, at 18:12–15 (making no mention of the three additional requested exclusions). Accordingly, the Court grants the motion as to the Governments requested exclusions (1), (2), and (3).

[2] The Court cites to the Court reporter's original rough draft of the hearing transcript. Any final transcript may contain slightly different page and/or line numbers.

country deportee on December 17, 2025. Resp. at 2, 3, 5. Originally, he was bussed to Villahermosa, Mexico. *Id.* at 2; Tr. of H'rg of Oct. 20, 2026, at 14:19–21. Villahermosa is in the south of Mexico along the Guatemalan border; Mr. Lopez-Padilla claims that he and others were bussed there despite previously being promised work in the north of Mexico near the border with the United States. Tr. of H'rg of Oct. 20, 2026, at 15:13–16. He remained in Villahermosa for about one and a half days. *Id.* at 16:17.

In Villahermosa, he saw and heard about discriminatory treatment of other Cuban nationals, and specifically other third-country deportees from the United States. Resp. at 5; Tr. of H'rg of Oct. 20, 2026, at 18:18–19:5; 26:11–14. This included seeing "Cubans relegated to gutters by other Mexican citizens and police[,]" and seeing "Cubans assaulted on the streets" in addition to reporting on television related to "the unwillingness of Mexicans to harbor Cubans." Resp. at 5; Tr. of H'rg of Oct. 20, 2026, at 18:20–19:5. Someone Mr. Lopez-Padilla did not know, also a Cuban national, "warned him to get out of the country before they got him too." Resp. at 4. Accordingly, he purchased a bus ticket to Juárez, Mexico and travelled in disguise to look like a local. *Id.* at 2; Tr. of H'rg of Oct. 20, 2026, at 17:20–21; 18:15–17. On his ride north, "he saw other non-Mexican migrants beaten, by civilians, by police, and by suspected cartels." Resp. at 4. However, he did not experience violence toward his own person on this bus ride. Tr. of H'rg of Oct. 20, 2026, at 17:17–18.

Once in Juárez, he rented a room at the Hotel Del Valle near the center of the city.[3] Resp. at 2. At the hotel, Mr. Lopez-Padilla saw men fighting at the corner nearby and one of the men tried to intimidate him while he was standing in the hotel lobby, wanting him to go outside. Sur-

[3] At the pre-trial hearing, Mr. Lopez-Padilla noted that he rented this hotel room as one place among many that he stayed during his time in Juárez, staying also at a shelter and as a guest in someone's home. Tr. of H'rg of Oct. 20, 2026, at 21:2–9.

reply at 2; Tr. of H'rg of Oct. 20, 2026, at 21:18–24. He went upstairs, and "saw a woman at the hotel trying to keep the men from coming in." Sur-reply at 3. He came to believe, based on what he was witnessing, that the men were coming after him and those same men were occupying his only exit in the lobby. Resp. at 3; Tr. of H'rg of Oct. 20, 2026, at 22:7–12. Accordingly, Mr. Lopez-Padilla "locked his room, went out the rear window onto a ledge, and jumped from the ledge to the street" after hearing footsteps going up the stairs, slipping on the way down. Sur-reply at 2; Tr. of H'rg of Oct. 20, 2026, at 22:23–23:6. He sustained injuries from his jump, experiencing growing pain over the following days. Resp. at 3–4. Although he did not know, his injuries included three broken ribs. *Id.*

Mr. Lopez-Padilla then came to believe that he could not receive medical treatment for his injuries in Mexico despite receiving medication from the local Doctors Without Borders facility to treat his pain and swelling. Tr. of H'rg of Oct. 20, 2026, at 19:23–20:4; 24:12–16. After receiving medication, he wanted additional treatment and diagnosis for his pain. Tr. of H'rg of Oct. 20, 2026, at 42:3–8. However, he did not go to the hospital in Juárez. *Id.* at 25:2–6. Fearing his life would be in danger if he remained in Mexico, Mr. Lopez-Padilla crossed into the United States, surrendering to Border Patrol upon entry.[4] Resp. at 3–4. Once in the custody of Border Patrol, Mr. Lopez-Padilla was taken to a hospital in El Paso, Texas. Tr. of H'rg of Oct. 20, 2026, at 32:5–12. There, he was diagnosed with injuries including broken ribs and knee swelling. *Id.* at 54:14–20. The hospital discharged him within three hours. *Id.* at 54:21–22 (referencing the proffered medical record, Ex. A).

[4] At the pre-trial hearing, Mr. Lopez-Padilla continuously noted his confusion about where the United States/Mexico Border was located and where the United States began, appearing to make a claim not covered in the briefing that he did not enter the United States intentionally, but rather it was only his "instinct" to return to the United States. Tr. of H'rg of Oct. 20, 2026, at 45:5–10. If this is the case, the Court notes that it may undercut his affirmative defense showing in altering both the objective and subjective necessity or duress that led to his unlawful reentry because he may no longer be claiming that the circumstances described caused him to enter the country. *Id.* at 38:12–17; 44:23–45:4; 47:9–14.

At the pre-trial hearing, Mr. Lopez-Padilla added additional context, stating that he had paid for lodging, food, laundry, and other items like a cane to aid his walking, with money from an account connected to a debit card. Tr. of H'rg of Oct. 20, 2026, at 26:25–27:11. The account contained money that he had earned while working in Chicago. *Id.* at 26:25–27:5. He clarified that he had travelled around on foot to lodging, restaurants, laundry, and a second-hand store. *Id.* at 42:23–43:21. Although he had travelled to Juárez from southern Mexico on a bus, he also stated that he did not go to the hospital in Juárez because he was told that it was far away and he lacked documentation. *Id.* at 25:12–14. He further explained that he did not pursue the option of going to Guatemala because he saw armed guards patrolling the border with Mexico, which indicated to him that Guatemala was dangerous. *Id.* at 32:17–33:2. Moreover, he stated that he did not attempt to cross at the port of entry in Juárez because he feared they would turn him away, as he had heard another Cuban man with a green card had been turned away. *Id.* at 30:4.

## II. Analysis

Affirmative defenses may be available to defendants facing charges of unlawful reentry. *See United States v. Meraz-Valeta*, 26 F.3d 992, 995–96 (10th Cir. 1994) (considering, but affirming, the denial of defendant's necessity defense in an unlawful reentry case) *overruled on other grounds by United States v. Aguirre-Tello*, 353 F.3d 1199 (10th Cir. 2004). This includes duress as well as necessity. *See id.* (concerning necessity); *United States v. Portillo-Vega*, 478 F.3d 1194, 1197–98 (10th Cir. 2007) (considering, but affirming, the district court's denial of a duress instruction in an unlawful reentry case); *United States v. Bustillos-Perea*, Nos. 25-2077, 25-2078, 2026 WL 1506670 at *2–3 (10th Cir. May 29, 2026) (same); *see also United States v. Leal Cruz*, 431 F.3d 667, 669–673 (9th Cir. 2005) (affirming the district court's duress instruction in an unlawful reentry case).

In the Tenth Circuit, the prima facie case for duress is "(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." *Portillo-Vega*, 478 F.3d at 1197. Further, a defendant seeking a duress instruction must "proffer evidence of a bona fide effort to surrender . . . as soon as the claimed duress . . . had lost its coercive force." *Id.* at 1201 (alterations in original) (quoting *United States v. Bailey*, 444 U.S. 394, 415 (1980)).

The prima facie case for a necessity defense is: "(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between defendant's action and the avoidance of harm." *United States v. Al-Rekabi*, 454 F.3d 1113, 1121 (10th Cir. 2006) (quoting *United States v. Unser*, 165 F.3d 755, 764 (10th Cir. 1999)). The first element—the complete absence of legal alternatives—is the touchstone of a necessity defense, requiring a defendant to "show he was 'confronted with . . . a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts.'" *Meraz-Valeta*, 26 F.3d at 995 (quoting *United States v. Seward*, 687 F.2d 1270, 1276 (10th Cir. 1982)) (emphasis removed).

Both defenses place the burden of proof by a preponderance of the evidence on the defendant. *Portillo-Vega*, 478 F.3d at 1197–98 (citing *Al-Rekabi*, 454 F.3d at 1122). And, before a defendant is allowed to present evidence on either defense, a court must find that defendant has made a sufficient proffer of evidence that would enable the defendant to meet its burden on each element of the defense at trial. *Portillo-Vega*, 478 F.3d at 1197–98 (citing *Al-Rekabi*, 454 F.3d at 1122); *see also Bailey*, 444 U.S. at 415–417. Courts "view the evidence favorably to [the defendant]" when evaluating whether a defendant has met this burden. *Portillo-Vega*, 478 F.3d at 1197 (quoting *Al-Rekabi*, 454 F.3d at 1123).

As relevant here, the Government argues that the Court should exclude all evidence that would support an affirmative defense not otherwise relevant to the elements of the charged offense unless Defendant makes a prima facie showing that he has sufficient evidence to prove each element of the relevant defenses by the preponderance of the evidence. Mot. at 4–8. The Government further argues in its Reply that the proffer itself is insufficient to establish duress or necessity and therefore Mr. Lopez-Padilla should be barred from mentioning or putting forth evidence related to these affirmative defenses. Reply at 2–6.

Mr. Lopez-Padilla counters that the proffer establishes each element of both duress and necessity by a preponderance of the evidence, requiring the Court to instruct the jury on both defenses. Resp. at 3–8. For duress, he argues that the perceived threats he faced in Mexico as a Cuban national, including the gang incident, satisfy the requirement for an immediate threat of serious injury or death. *Id.* at 2–5. He further argues that his fear was well-grounded because of the reporting of pervasive discrimination and danger that third-country deportees, especially Cubans, face in Mexico. *Id.* at 6–7. He also argues that he had no reasonable opportunities to escape the threats he faced in Villahermosa and Juárez aside from trying to go to Guatemala. *Id.* at 7–8. Finally, he argues that he did not resist Border Patrol once in the United States. *Id.*

As for the necessity defense, Mr. Lopez-Padilla argued at the pre-trial hearing that he has also met all three required prongs because he had no legal alternative to unlawfully reentering the United States as a result of both perceived threats that followed the incident that led to his jump from the hotel ledge as well as an inability to receive health care from injuries sustained as a result of the jump from the hotel ledge. Tr. of H'rg of Oct. 20, 2026, at 52:20–53:10. Further, Mr. Lopez-Padilla argues, like for his duress defense, that the perceived gang threats and growing pain from his injuries provided the required immediacy for a necessity defense. *Id.* Finally, Mr. Lopez-Padilla

argues that his unlawful reentry was the sole way in which he could avoid these threats because he could not receive health care in Mexico and felt threatened there. *Id.*

The Court finds that Mr. Lopez-Padilla has not proffered sufficient evidence for each element of either the duress defense or the necessity defense. This is in part because he has provided the Court with no comparable basis by which to evaluate how his medical claims could support a necessity defense. The paradigmatic example of the threat of harm that could establish a duress defense is committing the unlawful act at gunpoint, and thus under the direct, coercive, and immediate threat of harm. Mr. Lopez-Padilla has analogized the general threats, and incident at the hotel, to this example. However, he has not provided the Court with a basis by which to evaluate his claim that his injuries, and the medical care he thought he required, could support an instruction for a necessity defense for unlawful reentry.

In evaluating a necessity defense to unlawful reentry, which lacks an illustrative example in the existing case law, the Court considers the "traditionally" distinguishing nature of necessity from duress—its basis in a "situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils." *Bailey*, 444 U.S. at 409–10. In the case of unlawful reentry due to a medical need, the Court contemplates life-endangering circumstances analogous to the duress-at-gunpoint example that could make unlawful reentry into the United States a lesser evil than serious bodily injury or death. This may include, for example: someone bleeding out from an injury, and entering the United States unlawfully because there are emergency medical services just across the border; someone seeking care for a child who has stopped breathing, and entering the United States unlawfully for aid in resuscitating their child; or someone who starts having symptoms of a heart attack near the border and enters the United States unlawfully to seek help from the only person close enough to call for emergency services.

However, Mr. Lopez-Padilla has provided no citations to cases in which medical need led a court to instruct a jury on the necessity defense to unlawful reentry. He instead provides citations to only one case in the District of New Mexico in which a judge instructed on a necessity defense in an failure to depart case, *United States v. Belalcazar-Lucumi*, 2:11-cr-615-RB, and one case in which the Ninth Circuit acknowledged that a jury was properly instructed on a duress instruction in an unlawful reentry case, *Leal-Cruz*, 431 F.2d at 672. In each case, the threat of harm the defendant faced was sufficiently immediate as the examples discussed above, and their options were sufficiently limited to instruct the jury on the relevant defense.

In *Belalcazar-Lucumi*, the defendant's proffer of evidence was robust. It included documentation and testimony from the defendant supporting that, as a result of the defendant's previous work as a police officer working on drug trafficking cases in Colombia, several of his family members had been killed or forced to flee to other countries. *See* 2:11-cr-615 H'rg Tr., Mot. in Limine at 4 (June 29, 2011), ECF No. 34 (granting the Government's motion in limine to exclude evidence related to the duress defense, which was later granted on a motion for reconsideration). Likewise, in *Leal-Cruz*, the defendant testified that Mexican police officers had beaten and abandoned him two weeks prior to his unlawful reentry. 431 F.3d at 669. He only attempted to enter the United States when one of those same police officers spotted and began chasing him while he was pumping gas near the border, jumping over the border fence to escape the officer. *Id.*

Both cases, unlike here, contain facts specific to the defendants such that a reasonable jury could find that they were in immediate danger—Balalcazar-Lucumi's entire family fleeing from Colombia due to his previous policework, and Leal-Cruz fleeing the same police officer who had left him for dead two weeks prior. The threats here are comparatively abstract and distant in time.

Mr. Lopez-Padilla claims that he was threatened by a gang member in Juárez trying to enter his hotel. He felt so threatened by this that he jumped off of a ledge, sustaining injuries. The only explanation he has given for why these threats so affected him is what he observed in Mexico and the reports of Cuban third-country deportees facing serious danger and mistreatment in Mexico. However, Mr. Lopez-Padilla does not allege that he himself was a target of violence or received any direct threats. Rather, the fear that led to the jump from the ledge and that he highlights as a reason for his unlawful reentry came from the sound of footsteps on the hotel stairs and a general sense of danger based on his nationality.

In addition, any immediate danger stemming from the injuries incurred was causally related to Mr. Lopez-Padilla's own choice to jump from the ledge. There is no indication that jumping from the ledge was his only choice in that moment. And, most crucial here, there is no indication that either Mr. Lopez-Padilla's injuries were life threatening or that he had exhausted every lawful alternative to unlawful reentry to seek medical care for his injuries. Accordingly, Mr. Lopez-Padilla has not proffered sufficient evidence showing that he could prove any element of either defense by a preponderance of the evidence at trial.

**III. Conclusion**

For the foregoing reasons, **IT IS HEREBY ORDERED** that the Government's Motion in Limine, ECF No. 37, is **GRANTED.**

Margaret Strickland

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE